At this time, we'll hear Waiters v. Lee. Good morning. Good morning, Your Honors. My name is Rhea Grobe. I represent the appellant. Your Honors, counsel provided effective assistance in this case, and the district court's finding to the contrary was error. Additionally, the district court failed to properly apply ed pedeference in this case. Counsel forego putting in the entire medical records in this case because there was a significant downside to the expert testimony here. The intoxication defense in this case, particularly the high BAC that was present in the hospital records of the defendant, would have been diluted by expert testimony that could have come in because on cross-examination, evidence of defendant's high tolerance to alcohol would have significantly diluted that high BAC. And additionally, rebuttal evidence from experts, from the forensic doctors, to whom the defendant made statements that he wasn't intoxicated on the morning of the incident, also would have diluted the testimony. Plus, if you're as drunk as the Lord, you may not know that you're drunk. That is true, except for a lay jury hearing testimony. It was for the defense attorney to make the determination what would have been best, in his opinion at the time, to put before the jury. Where was the strategy needed, and what did he hope the jury would conclude? He was hoping that the jury would conclude, based on the witness testimony, of how much the defendant was drinking that day and the morning of the crime, and based on the two pages of the medical records that was admitted in over the people's objection, that the defendant was admitted into the hospital so intoxicated that he couldn't be assessed, that that would have been sufficient when he argued intoxication to the jury, that they would find the defendant not guilty by reason of intoxication. He didn't want the additional evidence of the defendant's high... He felt that the intoxication defense would be diluted by additional evidence of the BAC, the high alcohol level that the defendant actually had, that it would have been diluted by the high level of tolerance that defendant had. He didn't think the jury would... Didn't he offer the entire medical record? He tried to get it all in. He tried to get it all in. He included that portion of the tolerance. Yes, he did, and the prosecutor objected. In fact, the prosecutor basically gave an offer of proof at that time. The colloquy reflects that the prosecutor basically said, wait a minute, it shows that he was diagnosed with alcoholism, and the prosecutor went on to say this is just... The records here don't show just that he was intoxicated when he got to the hospital, but that he was treated for alcoholism, and he also intimated that he was going to put on the evidence of the forensic psychologist to show that the defendant made statements that he wasn't even intoxicated. I'm sorry. Just on the forensic psychologist, these were statements to the effect that I remember what happened that day. I was not intoxicated, and I was attempting to scare. To scare or to injure him. Basically that he knew what he was doing. Where was all this pointed? Was there a lesser included charge? The only lesser included charge that went to the jury was the manslaughter in the first degree. What? Manslaughter in the first degree. Okay. The intentional crime, because he was going for an all or nothing defense with the intoxication. He didn't request manslaughter in the second degree. At the time, he was still hoping that if he could get the jury to believe that the defendant was so intoxicated that it would negate his intent, he could get him off entirely. No intent, so intent was all. It was critical. Excuse me? Intent was critical. That was all. That's true. But it was still a reasonable decision for the attorney at that time to make. If the blood alcohol level was .39, that would be enough to kill somebody, right? To kill maybe a college freshman who's drinking for the first time. But we're talking about an individual here who's been drinking from the time he was 11. All you're saying is that a fantastically high blood alcohol content in the blood could be cross examined to suggest that it might not be as disabling to the mind and the intent as it may originally seem. In other words, it won't kill him. But how do you get it down to where it's not a really useful datum for the jury? In a case where the defendant made statements that he wasn't so drunk and in a case where he knew— You would agree. Do you actually think that with a blood alcohol level of .39, the jury would accept the idea that he wasn't drunk? Where the evidence showed that the defendant was able to leave the apartment, get a gun, come back in, hide the gun in a jacket, go back out, taunt Lorenzo Warren, shoot in the direction of Lorenzo Warren. Yeah, Your Honor. I believe with a guy who would drink a fifth of rum every two days, the high level of alcohol tolerance that this man had, it would have—saying .39 proviso with a guy like him, alcohol doesn't affect him so much. You believe the question really is what would have happened if the jury— I believe with expert testimony where they heard about alcohol tolerance on a person like him,  The prosecutor made a big point of this. The summation of the prosecution thought that this was not critical. I don't see why the prosecutor would have doubled down on it, emphasized the lack of exactly the evidence that the defense counsel declined to put in. That was fair comment on the evidence, but Your Honor— It was fair comment on the evidence, but the prosecutor knew that there was other evidence that wasn't before the jury. And even had it come in, the prosecutor would have made the same argument. But the judge was there, and the judge kept telling the defense counsel, basically, why don't you get an expert? It was not just once. I think it was three times. Now, why do you suppose the prosecutor thought it was important, the judge thought it was important, but the defense counsel didn't? But Your Honor, we also know from the hearing testimony that this defense attorney had spoken to experts. He already knew about the defendant's alcoholism. He already knew about the defendant's high tolerance to alcohol. He had spoken to medical experts. He was aware of the defendant's high blood alcohol level. This was not something new. So at the time that he already heard that the prosecutor was considering putting in the rebuttal evidence of the forensics, he decided to go with the fact that he knew he had medical witness testimony about how drunk the defendant was, and he had the fact that he had two pages of testimony coming in. We keep talking about what Simons did and intended, but he didn't have any memory of any of this. Your Honor, the standard is what a reasonable attorney at the time facing what he faced. One of the things you do is you ask the lawyer. He says, I must have had a strategy. I just don't know. It doesn't matter what he remembered at the time, Your Honor. At the time, he had a strategy, and the record shows that he had a strategy at the time, and that he chose to not put in the medical evidence, and he chose to go with what he had. And the strategy was what? And a reasonable attorney. And it was intoxication. He had to change his strategy mid-trial. The strategy was what? He chose to go intoxication based with the two pages of medical testimony that the court allowed in over the people's objection without putting in the downside to the rest of the medical records, and he chose to do that. And a reasonable attorney, faced with what he was facing at the time, may have done that. You're saying that the jury had the sheet of paper that said his blood alcohol content was .39? No. No, they didn't. They did not have that, and in hindsight, it's easy to critique what he did now. It's very easy to do that. I agree with you. This is not about hindsight. They did get into evidence the fact that he was intoxicated upon admission to the hospital and that he couldn't be assessed based on that, and he reasonably chose to go with that because he thought that that would be sufficient. The fact that he was incorrect in hindsight, it's easy to go back and say that, but the standard under Strickland is very high. And a reasonable attorney, faced with what he was facing at that time and knowing what his client had said to him, may very well have gone the way he did. And the court, you know, he put on the intoxication defense, and generally we fault attorneys for not putting on the defense. Now we're critiquing the way he put on the defense. And the fact that he put on the defense that way he did is something a reasonable attorney may have done, and the standard is very high. You told us that the reason that he didn't introduce this expert testimony is that he didn't want his intoxication defense diluted. Yes, Your Honor. It would have been significant. So did trial counsel testify to that effect, or is this your argument? This is our argument based on the facts of the case. At the time of the hearing. Trial counsel was asked at the hearing why he made the decision, and he didn't say what you said. He stated he no longer could recall why he did what he did. So the dilution argument, and, you know, it's, you know, I'm not commenting on it, but at the end of the day it's your theory, not trial counsel's theory. Trial counsel stated he couldn't recall what his theory was. That's right. I'm basing it on the trial record and the facts of the colloquy between what the prosecutor stated he was going to present, what evidence he was going to present at the time the old colloquy came out about it. What's the basis in the record for your dilution theory? The prosecutor stated that he was going to put forth, well, he put forth that the diagnosis in the medical records was alcoholism and that he was going to put forth the testimony of the forensic psychologist if the medical records came in. Just in somewhat summary fashion, can you tell us what the other evidence at trial was of intoxication? Sure. All the witnesses, Lorenza Warren testified that the defendant was drunk that morning. Jacqueline Warren testified as to the defendant's drinking habits and that that morning the defendant, she herself had drank two 8-ounce glasses of Bacardi lightened soda. She didn't recall how much the defendant drank that morning but that it was enough that she took the bottle away from him. Which witness testified that he only had one drink that day? I'm sorry? Which witness testified that he only had one drink? I don't believe anyone specified that he only had one drink. She said that they were drinking that morning and she didn't recall how much he drank but that she did take the bottle away from him because he drank too much. And Lorenzo also testified that... Lorenzo testified that he was intoxicated and he knew that because his speech was slurred that morning. When did the judge charge the jury with respect to intoxication? I don't recall the exact wording of the intoxication charge. Putting the exact words aside, did the judge in some substance tell the jury that if he was intoxicated they could consider that with respect to intent? Yes. That they wouldn't have to find him not guilty of the intent crimes. If what? If they found that he was too intoxicated that he could not formulate the intent. And that's the intent to kill Lorenzo? That was the intent, right. So am I right in understanding the record that when this is being discussed before the trial court, the admission of the medical records, that the prosecution is saying that if the records come in, or is this overstating the records so help me understand what's in it, they would call the expert, the psychological expert? They were contemplating bringing in the psychological experts to whom the defendant made statements that he knew what he was doing and that he was not drunk. Don't you find it indicative of the importance of this issue that the prosecutor attacked the defense in the closing argument saying, is he too drunk? Have you heard any evidence at all, ladies and gentlemen, that would suggest that he was so drunk that he couldn't intend what happened? The medical records are saying he was intoxicated. What does that mean? I don't know, ladies and gentlemen. It's something you don't know and you can't guess. It's something, somebody's observations at a hospital, great. How are you going to be able to tell intoxication from the effects of getting hit over the head with a fish aquarium? Who knows? Doesn't that really indicate the importance that the prosecution was placing on the data? And now you're standing there and you're saying basically it wouldn't have made any difference, but the prosecutor was arguing it made all the difference. Well, the defendant's summation was entirely based upon the intoxication defense. Correct. So the prosecutor at that point was doing what he could to try to negate that defense. By pointing out that what is missing, what is missing is the data. And it's no different than what- The data is that his blood alcohol was such that a college freshman would drop dead from it. And, Your Honor, and had that blood alcohol level come in and the same thing, the downside of it with the high tolerance come in, he still would have made the same argument. Well, you know, I don't want to be funny, but, you know, if a lawyer refuses to introduce any evidence because it might get cross-examined, they will have very short trials. Your Honor, my argument is not that an attorney could not have put that in as well. Just that faced with what he had at the time, he made a reasonable decision not to put that in. He thought it would not have been helpful. He thought he would have had a battle of the experts, and he thought it would have been less helpful to the jury at the time. Your view is that it would have hurt his intoxication defense if the jury heard that he was habitual drunk or was drunk all the time. Yes, Your Honor. I'm saying that it would have had an effect on the intent, that the jury may have looked at it. Well, you know, that would not have helped. If he's drunk like this or if he's, you know, if this is an individual who, you know, who has this tolerance to alcohol, well, then it's not going to affect his intent to be able to commit a crime. Look at what he was able to do. He was able to get up there. He was able to taunt him. He was able to get a gun. Look at all the actual acts that he was able to do that shows that his intent was certainly not impaired by his drinking so much. So it was up for the defense attorney how to make a decision, how to decide how to try his case. Now, I'm not saying another attorney would not have done it differently, but the standard under Strickland is the fact that what would a reasonable attorney— It looks like the trial judge would have done it differently because she was basically nagging him and pushing him. Only if he wanted to get everything in. But because he knew that there was going to be all this other evidence— She was saying, I could probably grant you a continuance. The prosecution, I think knowing the danger that we're now encountering, said, Oh, this is not an emergency. You know, we've got plenty of time. If you want to go and get an expert, you can do that. But she also might not have known at the time that he had already consulted with experts. We know that from the hearing that he had already consulted with experts and he already knew about the defendant and his tolerance to alcohol. So it's possible. That's why, at that time, he chose not to take that continuance. He thought he was going to go ahead with the fact that he had these two pages of medical records saying that he couldn't even be assessed due to his intoxicated state. So it's your position that this powerful evidence, the very high blood alcohol evidence, would have just opened the door to a set of summations which would have addressed the same issue, but instead of facing the argument that there's not evidence in here, there's very little evidence as to how intoxicated he was. How do we know he couldn't form an intent? There's not enough evidence. There instead would have been a set of summations that focused on the evidence that he himself said to the psychologist, and maybe there would be more focus on the Jacqueline's testimony that he said as to himself, I remember what happened. I was intending to scare Lorenzo or to hurt Lorenzo in the case of Jacqueline, and that that would have been the focus of the prosecution. Absolutely. When you say that the .39 would be fatal to a college freshman, where do you get that? Because the defendant was 130 pounds. Yes. Again, Your Honor, if we're talking about the level of tolerance, I'm just assuming that a young 18-year-old might not have the same amount of years of drinking. Thank you. I'm Megan Bennett. I represent Petitioner Appelli, General Waiters. I'd like to first address Judge Jacob's question with respect to the dilution argument. Dr. Strip testified at the evidentiary hearing that even a person who drank to the extent that Mr. Waiters did would have had at most a tolerance reduced by half of an ordinary person. So instead of .39 at pages A86 to 87 in the appendix, Dr. Strip says it would be about half, so it would be about .2. Earlier in his testimony, Dr. Strip says that an ordinary person at .2% would be experiencing blackouts, loss of consciousness, and amnesic effects. So it's possible that Mr. Waiters wasn't as close to death as the ordinary person would have been because of his habituation to alcohol, but he still, even at half of the blood alcohol level that he had an hour after the shooting, would have had serious cognitive impairment that went directly to the sole issue at trial, which was what was he able to form the requisite intent in this case. I'd also like to just- Can you help me understand the record about, and maybe the record is just unclear on this, as to when, did the expert say anything about when this alcohol may have been consumed? Because if I understand the timeline correctly, the defendant went out and bought cereal and milk that morning, comes back to the apartment before this crime takes place. So help me understand how he could be- what we understand about when the alcohol was consumed. So Dr. Strip testifies at the evidentiary hearing that given the blood alcohol level at the time it was measured at Kings County Hospital, which is approximately an hour after the shooting, and it could vary slightly depending on whether the blood alcohol level was taken pre- or post-absorption. It could have been that an hour earlier it was a little bit lower as the bloodstream was still absorbing the alcohol over the course of that hour between the shooting and the measurement, but that given the blood alcohol level of .39 at the time he was first admitted, that Mr. Waiters would have had to have consumed approximately 16 drinks the morning before the shooting. So there has been drinking the night before, but when asked on cross-examination by the district attorney's office, well, essentially, he was drinking all night before that. Couldn't the blood alcohol have been from the night before? Dr. Strip testifies, no, he would have had to have had more than 16 drinks if it was .39 at the time of the measurement. So .39 at the time of the measurement reflects 16 drinks that morning. Judge Livingston, you asked about who testified, I think it was Judge Livingston, asked who testified that didn't somebody testify that he'd only had one drink that morning. That was Jacqueline Warren, and she testifies, it's in the supplemental appendix at page 55. Was she with him that morning? She was with him that morning. She was not when he went out to get the cereal and come back, but during the time that they're drinking there's no testimony that they weren't in the same apartment and socializing together. And she was asked, do you know if the defendant had more than one drink? And she said no. So she doesn't say he only had one drink, and I'm sure the panel has reviewed the trial record to the extent that it's included in the habeas papers. The testimony from the prosecution witnesses is minimizing the alcohol consumption. Lorenzo Warren says General Waders was drunk at the time, but I've seen him much more drunk on the 10 other occasions when I've seen him. He was slurring, but I've seen him drunker. At some point Waders was intending to take the stand, is that correct? He had decided before. There was testimony from Calvin Simons that Mr. Waders was intending to take the stand. And was there testimony as to when Waders changed his mind? Yes. It's not in the supplemental appendix, but it appears in the trial transcript at page. Tell me, when was that? It was before there was any colloquy on the medical records. It precedes the decision on Mr. Simons' part to introduce the medical records. Mr. Simons informs the court Mr. Waders is not going to testify, and subsequent to that there is a discussion about whether or not the medical records will come into evidence. If you look at the transcript of this case, I mean there's alcohol all over it. There's no way the jury is not going to believe that this guy was anything but a heavy drinker, if not a drunk. Right. Agreed. The question, though, is whether at the time that the firearm was discharged, Mr. Waders had the capacity to form the requisite intent for purposes of either murder in the second degree or manslaughter in the first degree. And that critical question depended entirely not on his history of alcohol abuse or whether he'd been drinking, because voluntary intoxication is not a viable defense under the New York penal law, but rather what was the level of his intoxication with the district attorney's office? Obviously well knew, because that was the entirety of their summation on defense, the entirety of their summation on intent. As Judge Jacobs recited some of the examples of the language that the district attorney used in arguing to the jury, you can't know how drunk he was. What do we know from this? We don't know anything. The jury would have known if Mr. Simons had done what he had been trying to do. He says at the evidentiary hearing, I was intending to get all of the medical records in. And he takes exception to the judge's ruling precluding him from introducing the blood alcohol level. So it was not a strategic decision on Mr. Simons's part. Not only does he say I don't remember what my strategy was, you'd have to look at the trial record, but he actually says in the evidentiary hearing, I was intending to introduce all of the medical records. And when the judge precludes him from doing that because he decides not to get the expert. And to the government's point about the experts, by the way, the experts, quote unquote experts, that he consulted were family members. They were not people who the court would have been likely to qualify as experts. His father was a doctor. His father was an internist. He testifies that his father is an internist, that his brother is a trauma surgeon, and that his mother is a nurse. He doesn't say who reviewed the records. He doesn't say what he discussed with those people about the records. He claims that Dr. Drob had been consulted for expert medical purposes. But Dr. Drob is not a medical doctor. He's a psychologist. And when the expert is brought in at the evidentiary hearing, it becomes even more evident that the expert who was necessary at trial was somebody who could testify about the cognitive effects that you would have seen on a person, even somebody like Mr. Waiters who's habituated to the effects of alcohol, the cognitive effects you would see at .39% blood alcohol level. Unlike the Grenier against Wells case in which this court said, and that involved the same trial counsel, by the way, Mr. Simons testified at that evidentiary hearing exactly as he did in this case,  Your adversary points out that this is not the kind of case in which a defense counsel failed to advance an obvious defense. This is a defense that was advanced. There was evidence in support of it. And your argument is maybe it's substantial, but it's no more than the fact that the way in which this defense, which was advanced, was advanced was insufficient. Well, it's a good question. I think that would go to Judge Gleeson's determination that the state court adjudication in which the state court judge says the failure to introduce the medical records was a question of strategy. Judge Gleeson there gives ad pedeverance and presumes the correctness of the state court's decision that this was a question of tactics, or in her words, mere tactics. And the district court says that that presumption of correctness is overcome by clear and convincing evidence. And this court has said that on factual findings, which Judge Gleeson said, the determination that this was mere tactics was a factual finding, and the Supreme Court has said that the what happened line of questions is a factual finding. And this court has said there's a highly – the appellate panel has to be highly deferential to the district court's factual findings. So to the extent that Judge Gleeson's determination that the failure to introduce the medical records was not strategically reasonable, this court should defer to that factual finding of the district court. The lawyer was told – I mean, the lawyer has a client who's insisting that he really wasn't drunk. And the backdrop to the decision he makes was a client who says, I'm not drunk, and a client who when he's – when this counsel is planning his strategy, his client is going to take the stake. And so the jury had, it seems to me, just a plethora of evidence about alcohol, and your position is that there was more or better evidence of alcohol intoxication that could be interpreted – I mean, that could have been introduced. The jury had no evidence of the level of intoxication. The question wasn't – I hear day after day of testimony about drinking astounding quantities of liquor. They get this. But the jury charge – it's on page 88 of the supplemental appendix. The jury charge specifically says that with respect to the intoxication defense, in determining whether the defendant had the intent necessary, you may consider whether the defendant's mind was affected by intoxicants to such a degree that he was incapable of forming the intent necessary. And the prior paragraph told the jurors that intoxication is not as such a defense to criminal charge. Right, because voluntary – having poor judgment because somebody has consumed too much alcohol is not a defense. The defense is, does the level of intoxication impair the cognitive abilities of the defendant to such an extent that he or she cannot form the requisite intent? You have that theory. The jury would have had to throw out of the window or seriously discount the testimony, which it seems to me is essentially unconverted, about this guy's behavior leading up to the shooting. And he goes out, he gets the gun, he comes back, he has arguments in which – the arguments which are set before the jury. A jury could conclude – you might not conclude that, I might not conclude that – a jury could conclude that this is not the behavior of a man who has consumed so much alcohol that he reaches the standard you adverted to. But Dr. Stripp says in the evidentiary hearing, specifically with respect to that series of events directly preceding the shooting, that a person could have the physical capacity to engage in exactly what the behavior Mr. Waiters had engaged in, while still being essentially so cognitively impaired to not understand. And Dr. Stripp would not opine as to intent, which the state court rested part of her decision on, and that too was error because under New York law an expert cannot offer an ultimate – an opinion on intent in a criminal case. But Dr. Stripp did testify that a person could have the capacity to engage in that physical series of acts without being able to appreciate and – I'm not going to say form the intent – but not have the ability to sufficiently appreciate and understand what he was doing for purposes of – which would have gone directly to the intent question. Let me just ask, it seems I'm – my problem with your theory comes back to Dr. Bardet in a sense, and maybe you can help me with this. Because it just seems to me, reading the colloquy when these medical records were being discussed, the court says I'm going to let in this much, not the rest, unless you call an expert. And then the defendant had a choice. If they put on all the records, it's pretty clear to me that the government is going to respond by calling Dr. Bardet to the stand. And then something that is often referred to as some of the most powerful damning evidence to the criminal defendant, his or her own words, is going to come into evidence. And those words, if I understand the record correctly, are that I was – I remember what happened. I was not intoxicated. I wanted to threaten or I was scared by Lorenzo, and I was aiming my gun at him, essentially. Now, wouldn't that – I mean, you would replay the same intoxication defense before the jury, but now with the prosecutor dwelling on that statement as well as the testimony of Jacqueline, and wouldn't that have been – made it even harder to persuade the jury of this defense? Well, Jacqueline Warren had already testified as to a defendant – as to Mr. Waiters' inculpatory statement. So I'm not sure if the cumulative effect of a second statement – But her statement was – her statement was, as stated in the summations, she couldn't say exactly when the conversation took place, and the defense ably said, you can't credit this testimony. She was in the midst of this tragedy. She can't even tell us when the conversation occurred. But now her testimony, that I asked him why did he do what he did, he said he was coming after my son. Because he was coming between us. That testimony then would have been corroborated by the doctor's testimony. Well, and it was – so I think there are two – I would address it in sort of – in two parts. Initially, with respect to whether it would be – would undermine the intoxication defense because Mr. Waiters had purported – you know, had said to Dr. Bardet and to Dr. Graub, I hadn't been drinking. There is no reason – no reasonable lawyer would have failed to introduce the medical records out of fear that one of the two experts would have testified that Mr. Waiters had said something inconsistent with respect to drinking because, as we know from Dr. Strip, at .39, he likely didn't remember anything of what happened. And I would say that that also – at .39 blood alcohol level, he wouldn't have remembered what had happened. He might have thought that he did. Dr. Strip says that also, that, yes, he could have false memories and that he could falsely believe that he recalled what he was doing at the time, but that at .39, an ordinary person would have amnesic effects. And I think that also goes to the intent question, that there is no reasonable lawyer who would have failed to introduce objective evidence that so supported the intent defense, which was the only defense. At the point at which Mr. Simons opts not to introduce the medical records, the only defense he has is intent. And even if there is a statement from his client saying, I was scared of Lorenzo, which is what more or less the statement made to Dr. Bardet was, that there is – given what he should have known from a toxicology expert, there would have been no downside. So in Grenier v. Wells, this court said, if there is a significant potential downside to the foregone evidence, that can justify the lawyer's decision. Yep. Remind me specifically what the testimony was that Walter said about his own state of mind. Well, the – are we talking about the statement that he made to Ms. Warren? Because there was no testimony. What the jury heard. The jury heard from Ms. Warren that he called – that Mr. Waiters called from jail and that he had said – I apologize, Your Honor. No, that's fine. No need to do that. Okay, well, I could summarize, or do you want me to just pull it up from the – Summarize. Okay. That Mr. Waiters had called from jail and had apologized for the shooting and that he said that Lorenzo was coming between them, coming between Jacqueline and Mr. Waiters. So, I mean, if a jury credited that, which they were entirely within their province to do, I mean, there goes the alcohol defense. I don't think that follows. Assume that the records had come in with the assistance of a technology expert. A reasonable jury could conclude that this guy is saying, you know, I know what I was doing. Well, on the prejudice question, though, the test is whether there's a reasonable probability that the outcome might have been different. So I don't think that we need to say that he absolutely would have been acquitted. I think just because there's a reasonable probability that the outcome might have been different doesn't mean there wasn't also a possibility that the outcome would have been the same. But the critical question on the prejudice prong – But the jury was entitled to credit that. The jury would have been entitled to credit the – His testimony that he knew what he was doing, that he had a specific motive in shooting this guy, I mean, in firing this gun because he was afraid this man was interfering with a family relationship. Yes, the jury absolutely could have credited that. But I think the question for purposes of this appeal is, would a jury – Is there a reasonable possibility, probability, that a jury might have, had the other evidence come in, not credited Mr. Waiters' statement and instead considered – And it also could have been – It's not the AEDPA standard. The AEDPA standard is whether there's a reasonable probability that the outcome would have been different. So it's not that there – It's specifically not that there would have been an acquittal, but rather whether if the evidence that the lawyer failed to introduce – And again, there's no question that Mr. Simons did not have a strategic – No, and then he said he was trying to get in all of the medical records. So he clearly intended to get in the medical records and failed to do so, and he didn't articulate any reason – He could not come up with any strategic reason for why he failed to do so, and he had intended to do so. And I think the failure – Mr. Simons' failure to ask for the correct lesser-included offense is further evidence that he simply didn't appreciate the magnitude of intoxication here and the meaning of the medical records. Manslaughter in the first degree is intent manslaughter. It would have been a lesser-included, had there been an extreme emotional disturbance defense, which was abandoned long before the medical records issue arose. Manslaughter in the second degree should have been the lesser-included offense that was requested in light of the intoxication information. Well, add to that the role of setting strategies and considerations. Right. Right, and I think that sort of to the appellant's point of the all-or-nothing defense, this is – so I'm not arguing that that itself was an effectiveness, but I'm saying that that – The more you adopt the all-or-nothing strategy based on intent, it would seem that the more egregious is the failure to introduce evidence that he was drunk out of his mind. Certainly, if he was going for all-or-nothing on intent, he should have introduced the blood alcohol information irrespective of what his – whether irrespective of an all-or-nothing defense because intent was always the sole issue, and he asked for it, and he got the intoxication instruction. Thank you. Thank you, Your Honors. Thank you. Counsel here faced an overwhelming evidence of an intentional crime and a dead 3-year-old. He put forth the best defense of intoxication, and it was an uphill battle. He did so, and he chose not to put on an expert witness that he felt could have potentially undermined his intoxication defense. That he might have assumed because he doesn't know why he did or didn't. He doesn't remember. He doesn't remember. True. At the time of the hearing, he no longer remembered. It was six years after the trial. Now, no two attorneys would try a case the same way, and as long as a reasonable attorney acting from the perspective of trial counsel at the time of the trial might have chosen the strategy that he chose, counsel cannot be found ineffective. It is clear that the district court here – I mean, we had a hearing in the state court. The state court made factual findings, found that counsel's strategy at the time was reasonable. What's the basis? What did Justice Dowling conclude with respect to what the reasonable strategy would have been? She offered, like, three options, right? Well, she found that in light of the fact that when he first introduced – tried introducing the medical records, she knew that he was facing – he had a client who insisted that he was not intoxicated, and he was – Well, certainly at .39, he was in error, wouldn't you say? I would not say that he was in error. In light of – He was intoxicated. Oh, no, he was intoxicated, Your Honor. I am not saying the defendant was not intoxicated. We had witness testimony admitting he knew he was intoxicated. The lawyer was relying on the fact that his client told him he wasn't intoxicated. Well, despite the fact – But his client was insisting that he was not intoxicated. His client at the time was insisting on testifying. Well, in any event, intoxication was offered as a defense, so where does that – Once his client decided at the last minute he wasn't going to testify, the moment his client told the court, I'm not testifying, Mr. Simons got up and said, Your Honor, I would like to put in these medical records to show his intoxication. At that point, the prosecutor objected and said, Whoa, these medical records show that his diagnosis was alcoholism. And that's when he realized that, well, there was a significant downside in putting in the entirety of the medical records. He did get the court to agree to put in the fact, at least two pages of it, showing that he arrived at the hospital not intoxicated. What are the other strategic – The other strategic things went to the other aspects in terms of the – in terms of not asking for the lesser included, and I think there was another issue as well. What's the possible justification for not asking for the lesser included? At that time, he was – I think he really thought he could – And as he argued in summation, he told the jury, He's only charged with intent crimes. Because he was so intoxicated, he couldn't formulate the intent. You have to find him not guilty. He told that to the jury. He basically was going for that all-or-nothing strategy. He really thought he could try and tell the jury that they had to acquit him. All-or-nothing strategy. What's the justification for not getting and putting in the expert testimony? Because he thought he – I do believe he thought that once he put that in, he would have this battle of the experts who would confuse the jury with all this. It would lessen the impact of the intoxication. They already knew he was intoxicated. He thought he could argue to the jury he was intoxicated that the intoxication was so high without putting in this effect of tolerance. You're putting in .39, okay, but there's a proviso. He didn't want to do that because he thought it would confuse the jury. But the court properly charged the jurors. Under our law, intoxication is not as such a defense to a criminal charge. So in determining whether the defendant had the intent necessary, you may consider whether the defendant's mind was affected by intoxicants to such a degree that he was incapable of forming the intent. So the more you say that counsel put in evidence that he was intoxicated, the more it's clear that he put in evidence that the judge would properly say to the jury it doesn't matter. But once they also heard evidence that he said to the doctors, oh, I knew what I was doing and I wasn't drunk, combined with the actions that he took that morning about being able to, you know, he went out, he got the cereal and milk. Shooting a family member is not a sign of a sound judgment, wouldn't you say? He taunted. Shooting anyone, I would think, is never a sign of sound judgment. I know, but if the intent is to shoot somebody, that doesn't really negate the idea that his judgment was severely impaired. Exactly, Your Honor. So the fact that he was able to do that and he's arguing intoxication, he didn't also want the evidence that the defendant said, I wasn't intoxicated there in front of the jury. He didn't want to, he didn't, this is a jury who wouldn't necessarily understand. You know, they hear .39 and they hear evidence from an expert saying, yeah, .39 is very drunk, but then they also hear, well, .39 for a person who drinks so much, you know, that kind of lessens the effect of the alcohol. So it was a strategic decision. Obviously it didn't work. Again, under which the testimony that he was coming after my, I knew what I was doing, he was coming after my son came in. Was that before the decision was made about the expert? I'm sorry? There was testimony about a conversation that took place from the jailhouse. Jacqueline Warren, at the end of her testimony, testified that about a year after the crime, the defendant contacted her from jail and testified, and she said that he said he was sorry, he aimed at Lorenzo because he was coming between them. And when was that testimony adduced with respect to the, in connection with the expert issue? That would have come in beforehand. It was part of the people's case. It was before the people arrested. The expert issue was at the very end of the trial. It was at the very end of the trial after all the people's testimony came in. I don't recall who the last people's witness was. That's why there was an issue as to whether the judge would accommodate the defense by addressing the problem. It must have been at the end. There may have been a police witness afterwards. I think there may have been some police witness that came after that, but I'm not sure. Well, thank you both. Expertly argued, I must say. We will reserve the decision. The final case on calendar is Neroni v. Zayas. We're taking that on submission. That's the last case on calendar. Please adjourn the court. Court stands adjourned.